UNITED STATES of America ex rel. Sidney FOSTER, Petitioner-Appellant,

v.

Richard DeROBERTIS, Warden, Respondent-Appellee.

No. 83–2881.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1984.
Decided Aug. 16, 1984.

Omer G. Poirier, Jenner & Block, Chicago, Ill., for petitioner-appellant.

David E. Bindi, Asst. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before PELL and COFFEY, Circuit Judges, and DUMBAULD, Senior District Judge.*

PELL, Circuit Judge.

Petitioner Sidney Foster appeals the district court's denial of his petition for a writ of habeas corpus. In August 1975, petitioner was convicted of murder and concealment of a homicidal death by an Illinois trial court. The Illinois Appellate Court, by a divided panel, reversed, finding that the trial court erred in not holding a pre-trial competency hearing and that the State had failed to prove beyond a reasonable doubt that petitioner committed the murder and was sane at the time he concealed the homicide. *People v. Foster*, 56 Ill.App.3d 22, 13 Ill.Dec. 869, 371 N.E.2d 961 (1st Dist.1977). The Illinois Supreme Court reversed and reinstated the convictions. *People v. Foster*, 76 Ill.2d 365, 29 Ill.Dec. 449, 392 N.E.2d 6 (1979). The district court granted summary judgment to the State on petitioner's habeas corpus petition. On appeal, petitioner once again asserts that he was entitled to a competency hearing, was convicted on insufficient proof, and was prejudiced by the trial court's erroneous evidentiary rulings. We will consider each claim in turn.

I Facts

Petitioner lived with the murder victim, Vivian Patterson, and her four children. Petitioner's relationship with Patterson was close but platonic. Petitioner claims to be a transsexual; a biological male with female gender identification. Unbeknown to Patterson, petitioner forced her son Solomon Hudson to engage in homosexual acts. Petitioner also believed that he was somehow the father of Solomon. There was evidence that during December of 1973 petitioner confided to Diane Adams, a friend, that he was worried that Patterson might move to California with her children and leave petitioner behind.

On December 18, 1973, petitioner borrowed a .38-caliber Rohm revolver and six rounds of ammunition from Edward Thomas. Petitioner explained to Thomas that he needed the gun because of harassment in his music recording business. At petitioner's request Thomas placed the gun and bullets in a camera case. On the evening of December 31 petitioner returned the gun. Petitioner told Thomas that "he thought he got the dude and wouldn't be needing the gun any more." The gun contained only two bullets, one of which had misfired.

During most of December Patterson's children stayed with her ex-husband, Lucius Hudson. One of the children, Sandra Hudson, saw Patterson on December 27 or 28, but did not see her when she visited the apartment on December 29 or 30. Solomon was similarly unable to reach his mother when he called home on December 29. Petitioner told the children that Patterson had gone to California. Petitioner told the children not to tell Lucius Hudson about their mother's trip. When Solomon returned home on the 31st, petitioner told him that his mother had been in a plane crash in California and was in critical condition. During January petitioner told the plane crash story to several of Patterson's friends.

Sometime around New Year's Eve petitioner met Wilbur Richburg and Marvin Morgan and offered them $5,000 each to help dispose of Patterson's body. The men went to Patterson's apartment to view the corpse, which was in the bedroom. Richburg and Morgan left the apartment after arranging to return. During January the children complained of a bad smell emanating from their mother's bedroom, which petitioner kept locked. Petitioner claimed that the smell was caused by chicken bones, but refused to let the children into the bedroom.

Late in January Richburg and Morgan returned to the apartment with cardboard barrels. Unable to fit Patterson's 300 pound body into the barrels, the men dis-

---

* Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, sitting by designation.

membered it and wrapped the pieces in sheets. Richburg and Morgan dragged the body to petitioner's car and placed it in the trunk. Petitioner removed the "license-applied-for" sticker from his windshield and suggested that someone keep a watch out for the police. On January 23 petitioner kept watch over the car from a window in the apartment. He then left the apartment to make a phone call and took Sandra along. Petitioner told Sandra that she "was going to hate him for the rest of [her] life." Petitioner then picked up the other children from school and explained that he needed two plane tickets in false names for Solomon and himself. When petitioner took Solomon to the home of petitioner's parents he noticed detective cars parked out front. Petitioner then went to the home of his sister. The next day, petitioner turned himself in.

The police discovered Patterson's body on January 23. The only identifying marks on the car were a "Cee Fred" sticker and the auto identification number. The police learned through "Cee Fred" that the car belonged to petitioner. The body was taken to the morgue. An autopsy did not reveal the date of death, but did reveal that Patterson died from a bullet wound in the head from a .38-caliber weapon. A bullet removed from the body demonstrated characteristics found in bullets fired from certain Rohn revolvers and certain other weapons. The police could not examine Thomas's revolver as he had lent it to another friend, who subsequently lost it during a chase by the police.

After surrendering to the police, petitioner made a number of statements. Petitioner admitted some involvement in disposing of the body, but denied any responsibility for the killing. At first petitioner claimed that "the mafia" killed Patterson with a machine gun. Petitioner then claimed that a drug dealer named "Jiggy"—also referred to as "T–Bone" and "Jimmy Wayne" —committed the murder. At all times petitioner claimed that the murder took place on December 28. Petitioner stated that Jiggy had warned him not to tell anyone what had happened. According to petition-

er, Jiggy and his friends dismembered Patterson's body and placed it in petitioner's car. At trial petitioner admitted that this final claim was not true and that he had arranged with Richburg and Morgan to conceal the body. After petitioner was released on bail he tried to commit suicide by swallowing 25 aspirins.

Petitioner claimed that he did not commit the murder and relied upon an insanity defense to the concealment charge. In support of his defense, petitioner presented Dr. Mehlinger. Dr. Mehlinger testified that petitioner suffered from a "transient situational disturbance" at the time he concealed Patterson's death and could not appreciate the criminality of his actions. On cross-examination Dr. Mehlinger admitted that his evaluation was based on only one 90-minute interview 18 months after the crime, that he assumed that petitioner was not the killer, and that he was surprised to learn at trial that petitioner had obtained a gun as he had thought that petitioner would not be so aggressive.

In addition to evidence of his mental problems, petitioner presented two witnesses who claimed to have seen Patterson alive in early January. This claim was also made by one of the prosecution's witnesses. However, none of Patterson's children saw her alive after December 28.

## II Pre-Trial Competency Hearing

Three days prior to trial petitioner's counsel filed a motion requesting that petitioner be examined by a psychiatrist and that the court hold a hearing on the question of petitioner's competence to stand trial. In support of this motion counsel stated that he had reasonable grounds to believe that petitioner was incompetent based upon his observation of petitioner and upon confidential information received from petitioner. Counsel stated that he had consulted with a psychiatrist on the question of petitioner's competence.

At the court's request, counsel made an offer of proof. Counsel produced handwritten statements that petitioner gave to

the police, including one in which petitioner stated that "I don't know if I am in my right mind," and opined that petitioner's handwriting indicated that he was mentally disturbed. Counsel offered proof of the nature of the crime and petitioner's suicide attempt. In addition, petitioner himself testified at length upon a number of subjects, many of which were not directly related to his current competency. Petitioner stated that he understood that he had hampered his defense by not telling the truth about the concealment in the beginning and indicated that he knew what the charges were against him. The court refused to grant counsel a continuance to obtain a psychiatrist to whom counsel had spoken previously. The court found no bona fide doubt about petitioner's competency and refused to order a psychiatric examination of petitioner.

■ The question of a criminal defendant's competency to stand trial revolves around whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). Neither petitioner nor respondent here questions that petitioner was entitled to a hearing on his competency if he raised a bona fide doubt about his ability to consult with his attorney or his understanding of the charges against him. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

■ The determination whether a bona fide doubt exists as to a defendant's competency should be based on "evidence of [his] irrational behavior, his demeanor at trial, and any prior medical opinion." *Drope*, 420 U.S. at 180, 955 S.Ct. at 908.

Our review of the court's decision that no bona fide doubt existed as to petitioner's competency is limited to consideration of the evidence before the court at the time of the decision. Facts coming to light at a later time cannot retroactively invalidate the court's decision. *Reese v. Wainwright*, 600 F.2d 1085 (5th Cir.1979), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410; *United States v. Mills*, 597 F.2d 693 (9th Cir.1979). Of course, if evidence produced during trial raised a bona fide doubt the court would be under a duty sua sponte to order a hearing, but petitioner makes no such claim here.

This case comes before us by way of habeas corpus, so the question arises as to the appropriate deference we should show the State court's finding of no bona fide doubt, which finding was affirmed by the Illinois Supreme Court. Under 28 U.S.C. § 2254(d), we are required to presume that a factual determination by the State court is correct unless one of several situations exists, including a finding that the "factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). The Supreme Court recently applied this standard to review of a determination of competency. *Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam). We see no reason for not applying the same standard here.[1]

■ The court's decision here is amply supported by the record. We do not accept petitioner's claim that the court was obligated to accept counsel's claim that his client was incompetent without question. While we have recognized that counsel is in a position to evaluate a defendant's ability to understand the proceedings and to assist in his defense, *Rivers v. Franzen*, 692 F.2d 491, 500 (7th Cir.1982), we have never accepted the proposition that a bare assertion by counsel is enough to raise the required

---

1. We are unpersuaded by petitioner's argument that he did not receive a full and fair hearing in which to establish a bona fide doubt and that the presumption of correctness should not apply. 28 U.S.C. § 2254(d)(6). Petitioner's counsel was allowed a great deal of leeway in presenting his offer of proof. Petitioner appears to be claiming a right to a full-blown hearing in which to establish the existence of a bona fide doubt, which in turn would require a hearing on the ultimate question of competency, but such is not the law.

bona fide doubt as to a defendant's competence. To accept petitioner's claim would be to eliminate the requirement that a defendant introduce some facts that raise a bona fide doubt before a court is obligated to postpone a trial and conduct a competency hearing. Petitioner's claim has not been accepted by other courts, *Reese v. Wainwright,* 600 F.2d 1085 (5th Cir.1979), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410; *United States v. Mills,* 597 F.2d 693, 699 (9th Cir.1979), and we decline to follow it now. Counsel is not relieved of his obligation to bring to the court's attention facts showing a bona fide doubt as to the defendant's competency by claiming that the information was received in confidence. A defendant cannot hope to avoid trial by claiming incompetence and at the same time refuse to divulge the basis for his claim. This remains true whether defendant is attempting to establish incompetence or only a bona fide doubt on that score.

■ Turning to the facts presented to the court, counsel presented evidence of petitioner's past behavior and current ability to assist in his own defense. While petitioner's behavior during the commission of the crimes can be viewed as indicative of some mental illness, it is of little relevance to his ability 18 months later to assist in his own defense. Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. *United States ex rel. Crossman v. Pate,* 440 F.2d 535 (7th Cir.1971). Here the evidence concerning petitioner's actions revealed nothing about his present competency.

The court was also presented with an adequate opportunity to observe petitioner during petitioner's testimony. At no point did petitioner exhibit any sign of incompetence, and in fact he appeared quite capable of assisting in his own defense. The court properly determined that there was no need to have a psychiatrist, who had not examined petitioner, explain the evidence presented to the court. The court's determination that petitioner raised no bona fide doubt as to his competency is amply supported by the record.[2]

### III Sufficiency of the Evidence

■ Petitioner complains that the State failed to prove beyond a reasonable doubt that he committed the murder or that he was sane at the time he concealed Patterson's body. At the outset we are confronted by a question concerning the standard we should apply. The Illinois Supreme Court held that the prosecution in a case relying on circumstantial evidence must exclude every reasonable hypothesis of innocence, and found that the prosecution had done so in this case. *People v. Foster,* 76 Ill.2d 365, 29 Ill.Dec. 449, 392 N.E.2d 6 (1979). Petitioner claims that the court erred in finding that the prosecution had produced sufficient evidence under the hypothesis of innocence test and argues that we must apply the same test on review. However, the federal formulation of review of the sufficiency of the evidence is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Recently, in *United States v. Moya,* 721 F.2d 606 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984), we found that the *Jackson* test requires a reviewing court to assume that the jury drew all reasonable inferences in the prosecution's favor, while "[t]he hypothesis of innocence test ... requires the reviewing court to put aside the prosecution's inferences and to determine

---

**2.** The State has argued that petitioner's failure to raise the issue of the competency hearing in his motion for a new trial or in his appellate brief—petitioner raised the claim during oral argument on his appeal—constitutes a waiver of this claim. While the State's argument is persuasive, we need not decide the issue and the accompanying issue of whether petitioner can show cause for the waiver and prejudice, as the record is adequate to decide the merits of petitioner's claim.

whether the trier of fact could reasonably conclude that the evidence is inconsistent with the defendant's hypothesis." 721 F.2d at 610. We held that the *Jackson* test was the proper standard to apply in reviewing the sufficiency of the evidence.

If Illinois' application of the hypothesis of innocence test conforms to the *Moya* formulation we will be required to decide whether a federal habeas corpus court is empowered to review a state court's application of a standard that is mandated only by state law. We seriously doubt that our power to correct constitutional errors encompasses the power to determine the propriety of a state court's application of state law; such a reading of the due process clause would mean that any complaint a defendant has with a state court's decision would constitute a cognizable constitutional claim. While we are not persuaded that this expansive view of the scope of federal habeas corpus relief is warranted, we need not decide the issue as Illinois' application of the hypothesis of innocence test gives due deference to the jury's power to draw reasonable inferences from the evidence.

In articulating the standard of review the Illinois Supreme Court made clear that it was the province of the jury to draw inferences from the evidence and that the prosecution may succeed in eliminating every hypothesis of innocence by showing that the defendant may be lying. After giving due deference to the jury's role as fact finder, the court found the proof sufficient to sustain the conviction for murder and the conviction for concealment of a homicide. The court's analysis indicated that it was following essentially the same test as set forth in *Jackson*, and that is the test we will apply. We will examine the evidence as it pertains to each crime in turn.

### A. Murder

 In order to establish the crime of murder the prosecution must prove beyond a reasonable doubt that the petitioner killed Vivian Patterson without lawful justification by performing acts that caused her death with the intention to kill or do great bodily harm. Ill.Rev.Stat. ch. 38 § 9–1. The prosecution's theory in this case was that petitioner became worried that Patterson would move to California with Solomon, and so obtained the gun from Thomas and confronted Patterson, ultimately killing her.

Petitioner claims that the prosecution used impermissible inferences from the evidence to support its theory. First, petitioner states "[n]o inference at all can legitimately be drawn from Foster's possession of a weapon." We do not agree. On the contrary, we think that the jury could permissibly infer that petitioner borrowed the gun and ammunition to use against Patterson. Although there was no conclusive proof that the gun owned by Thomas was the murder weapon, there was ample proof that the bullet that killed Patterson was fired from a 38-caliber revolver such as that owned by Thomas. The missing rounds of ammunition and the misfired cartridge left in the gun provide sufficient proof that petitioner fired the gun at some point during the time he had it in his possession. There was also sufficient proof that the murder took place during the time petitioner had the gun.

Petitioner also argues that his homosexual relationship with Solomon does not provide a motive for him to kill Patterson. Again, we disagree. Petitioner's relationship with Solomon and his fear that he would lose access to the boy if Patterson moved provide a credible motivation for petitioner to commit the murder. Petitioner asks us to ignore reality in arguing that fear of loss of a long-term sexual partner cannot be a motive for murder.

Finally, petitioner claims that his actions in concealing Patterson's body do not support an inference that he committed the murder. We cannot agree. Petitioner's concealment of the murder, coupled with his bizarre and inconsistent explanations of the murder, support the inference that he was responsible for the death of Patterson. We have long recognized that a defendant's attempt to conceal a crime is proba-

tive of a consciousness of guilt. *United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir.1975), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976). That petitioner offered an explanation for his involvement in concealing the body that was consistent with his claim of innocence of the murder is irrelevant on review of the jury's verdict. The jury was not required to believe petitioner and could instead reasonably infer that his actions were indicative of guilt. This inference was bolstered by petitioner's statement to Sandra Hudson that she would hate him for the rest of her life, and by petitioner's expressed desire to flee with Solomon under assumed names.

Keeping in mind the limited nature of review of a jury's verdict, we find that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. Our job is not to reweigh the evidence or to determine questions of credibility, but only to determine if a rational trier of fact could find petitioner guilty beyond a reasonable doubt. In this case the evidence was more than sufficient to support the jury's verdict.

. B. Concealment of the Homicide

Petitioner does not claim that he did not conceal the death of Patterson, but does claim that he was not sane at the time of his actions. In support of this claim Dr. Mehlinger stated that petitioner suffered from a transient situational disturbance; in essence that overwhelming stress or trauma caused petitioner to become psychotic, irrational, and delusional. Petitioner now argues that the State, because it failed to introduce any expert testimony to rebut Dr. Mehlinger's assertions, failed to prove his sanity beyond a reasonable doubt.

 To prevail on this claim petitioner must convince us that the evidence was such that no reasonable person could conclude that petitioner was sane at the time of the crime. *United States v. Kennedy*, 578 F.2d 196 (7th Cir.1978), *cert. denied*, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 709 (1978). To prove sanity beyond a reasonable doubt the State need not produce expert testimony, but may instead rely on lay witnesses, proof of a defend-

ant's rational behavior, and cross-examination of defendant's expert. *Id.* at 198. Here, the State successfully undermined Dr. Mehlinger's testimony by exposing his ignorance of petitioner's possession of a gun, which ran counter to Dr. Mehlinger's assessment of petitioner's personality, and the flimsy basis of Dr. Mehlinger's conclusions. In addition, the State produced evidence that petitioner's actions in concealing the body were rational and demonstrated an awareness of the wrongfulness of his conduct. Petitioner removed his "license-applied-for" sticker from his car, kept a watch out for the police, and offered untrue, exculpatory statements to the police when confronted with the evidence of the crime. Based on this evidence, a rational jury could find petitioner sane beyond a reasonable doubt.

IV Evidentiary Rulings

 Petitioner's final contention is that the court erred in admitting Solomon's testimony concerning his homosexual relationship with petitioner and in refusing to allow into evidence testimony concerning the existence of a man named Jiggy, which was one of the names petitioner used in attempting to extricate himself from the murder charge.

In addressing the admissibility of both items of evidence petitioner pays only lip service to the standard of review applied to state court rulings during federal habeas corpus proceedings. As we recently recognized:

Under 28 U.S.C. § 2254, a federal court is authorized to issue a writ of habeas corpus in behalf of a person in custody under the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." Because the admissibility of evidence in state courts is a matter of state law, evidentiary questions are not subject to federal review under § 2254 unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right.

*United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515, 517 (7th Cir.1982).

The issue before us, then, is not whether the trial court erred as a matter of state law in balancing the relevance and prejudicial impact of the evidence, but whether the trial court's decisions deprived petitioner of a fundamentally fair trial. In both instances we find that the court's evidentiary rulings did not deprive petitioner of a fair trial, whatever their merit as a matter of state law. Petitioner's relationship with Solomon was relevant as it established petitioner's motive for murdering Patterson. It was well within the court's discretion to find that the relevance of this testimony was not outweighed by its prejudicial impact. The same is true of the court's decision to exclude testimony regarding the existence of a person named Jiggy, which would only prove that petitioner did not make up the name but would prove nothing about Jiggy's involvement in the killing. Petitioner's complaints concerning the court's evidentiary rulings are, accordingly, without merit.

For the reasons stated in this opinion, the district court's denial of petitioner's petition for a writ of habeas corpus is AFFIRMED.